# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **TINA HICKMAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 11-1039-JAR** |
| | ) | |
| **LSI CORPORATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

## MEMORANDUM AND ORDER

Plaintiff Tina Hickman brings this action against Defendant LSI Corporation ("LSI") under the Employee Retirement Income Security Act of 1974 ("ERISA"), seeking judicial review of LSI's denial of short term disability benefits. This matter is before the Court on the parties' cross-motions for summary judgment (Docs. 38 and 43). As described more fully below, the Court denies Plaintiff's motion for summary judgment and grants LSI's motion for summary judgment.

## I.     Background

Plaintiff was employed as an accountant by LSI and was a participant in The LSI Corporation Short Term Disability Benefit Plan ("STD-Plan"). The STD-Plan used Matrix Absence Management, Inc. ("Matrix") to administer the plan for initial determinations and used the ERISA Appeals Committee ("Committee") to administer appeals from adverse initial determinations. Matrix denied Plaintiff's claim for short term disability in January 2009 and Plaintiff appealed. Plaintiff's appeal was denied by the Committee on April 23, 2009.

## II.     Standard of Review

ERISA gives Plaintiff, as plan beneficiary, the right to federal court review of the denial of her disability benefits.[1]  "[I]n ERISA cases seeking review of a denial of ERISA benefits, the court's review is 'limited to the administrative record,' i.e., the materials compiled by the ERISA plan's administrator in the course of making its decision."[2]  This case is governed by the standards applicable to an appeal of an administrative decision, and "the court acts as an appellate court and evaluates the reasonableness of a plan administrator or fiduciary's decision based on the evidence contained in the administrative record."[3]

Plaintiff concedes that LSI's STD-Plan provides discretionary authority to LSI to interpret its terms and conditions as well as to determine eligibility for benefits.  Because the STD-Plan gives the administrator discretionary authority, "we employ a deferential standard of review, asking only whether the denial of benefits was arbitrary and capricious."[4]  Under this standard, "review is limited to determining whether the interpretation of the plan was reasonable and made in good faith."[5]  The decision of the plan administrator will be upheld "so long as it is predicated on a reasoned basis," and "there is no requirement that the basis relied upon be the

---

[1] 29 U.S.C. § 1132(a)(1)(B).

[2] *Berges v. Standard Ins. Co.*, 704 F. Supp. 2d 1149, 1155 (D. Kan. 2010) (quoting *Holcomb v. Unum Life Ins. Co. of Am.*, 578 F.3d 1187, 1192 (10th Cir. 2009) (citation omitted)).

[3] *Panther v. Synthes (U.S.A.)*, 380 F. Supp. 2d 1198, 1207 n.9 (D. Kan. 2005) (citing *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1579 & n.31 (10th Cir. 1994)).

[4] *Eugene S. v. Horizon Blue Cross Blue Shield of N.J.*, 663 F.3d 1124, 1130 (10th Cir. 2011) (quotations omitted).

[5] *Id.* (quotations omitted).

2

only logical one or even the superlative one."[6]  "Consequently, the Tenth Circuit has observed that the arbitrary and capricious standard 'is a difficult one for a claimant to overcome.'"[7]  The Court looks for "substantial evidence" in the record to support the administrator's conclusion, meaning "more than a scintilla" of evidence "that a reasonable mind could accept as sufficient to support a conclusion."[8]  "The substantiality of the evidence must be evaluated 'against the backdrop of the administrative record as a whole.'"[9]

Plaintiff argues that LSI was operating under a conflict of interest and, therefore, less deference should be granted to its decision.  Plaintiff argues that because LSI's Appeals Committee determines eligibility and LSI is responsible for paying claims, there is a conflict of interest.  More specifically, the Committee is composed of persons who are interested in cost efficiencies for LSI based on their jobs at LSI.  Thus, Plaintiff argues that the Court should consider LSI's conflict of interest as a factor in determining if LSI has abused its discretion in denying Plaintiff's claim for STD benefits.

Plaintiff argues that two members of LSI's Appeals Committee are interested in cost efficiencies or finances for LSI, as indicated by their position titles.  Karen Miller is the Treasury and Risk Manager at LSI, and Kathy Kost is the Vice President of World Wide Human

---

[6]*Id.* at 1134 (quotations omitted).

[7]*Berges*, 704 F. Supp. 2d at 1174 (quoting *Nance v. Sun Life Assur. Co. of Canada*, 294 F.3d 1263, 1269 (10th Cir. 2002)).

[8]*Eugene S.*, 663 F.3d at 1134 (quotation omitted).

[9]*Berges*, 704 F. Supp. 2d at 1175 (quotation omitted).

Resources Operations at LSI.[10]  LSI has submitted the declarations of these two individuals.[11]

Although these declarations were not part of the administrative record, they can be considered

with regard to the conflict of interest allegation.  Although supplementation of the administrative

record is not permitted regarding eligibility for benefits, where a claim of dual-role conflict of

interest is alleged, supplementation is allowed.[12]  This evidence only becomes relevant when the

conflict of interest argument is raised and therefore it has not previously been entered into the

administrative record.[13]

      LSI argues that Plaintiff speculates, because the titles of two members of the Committee

could be read to imply that they are interested in LSI's financial performance, but actually, the

Committee members are unbiased because neither their pay nor their performance are tied to

how they decide appeals.  Titles alone are not probative of whether the person holding the title

has an interest in the outcome of Plaintiff's appeal.  Further, members of the ERISA Appeals

Committee are not compensated based on how they decide appeals.[14]  Instead, "[t]he goal and

responsibility of the LSI ERISA Appeals Committee in deciding each and every appeal it is

presented with is to decide each appeal fairly, correctly, and without bias."[15]

      Plaintiff responds that she does not contend that the members of the ERISA Appeals

Committee receive compensation or favorable reviews based on how they decide cases, but

---

[10]Docs. 48-1, 48-2.

[11]*Id.*

[12]*Eugene S.*, 663 F.3d at 1129 (citation omitted).

[13]*Id.* at 1130.

[14]Docs. 48-1, 48-2.

[15]*Id.* at ¶ 5.

rather the apparent high level positions they hold at LSI aligns their interests with those of LSI. Plaintiff argues that even if their compensation is not impacted by decisions of the committee, they should be "walled off" from the firm's finances and that an executive in the firm cannot be separate from the firm's finances when the executive's administrative position is sufficiently elevated.  Plaintiff argues that these two LSI employees make no claim in their declarations that they are not interested in LSI's finances, nor could they reasonably do so.

In *Metropolitan Life Insurance Co. v. Glenn*,[16] the Supreme Court held that when an ERISA fiduciary is responsible for determining, in its discretion, eligibility for benefits under an employer-sponsored plan and is also the party responsible for paying claims, a conflict of interest exists.[17]  The Supreme Court held that a reviewing court should consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits; and the significance of the factor will depend upon the circumstances of the particular case.[18]  The Supreme Court held that:

> The conflict of interest . . . should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration. . . .  It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.[19]

---

[16]554 U.S. 105, 128 S. Ct. 2343 (2008).

[17]*Id*. at 114.

[18]*Id.* at 105.

[19]*Id*. at 117 (citations omitted).

Plaintiff has not presented evidence that LSI has a history of bias or that the provision of benefits under the STD-Plan had a significant economic impact on LSI.[20]  LSI used Matrix, an independent claims administrator, to make the initial determination.  The Committee reviewed all of Plaintiff's health care providers' records, and it retained Dr. Dikranian to perform an independent review.  Reviewing records of the claimant's health care providers and requesting an independent physician to review the claimant's medical records are appropriate steps to reduce bias.[21]  Although the Court will weigh the conflict of interest "as a 'facto[r] in determining whether there is an abuse of discretion,'"[22] the Court finds that the conflict should be given limited weight in this case.

## III.    Uncontroverted Facts

Plaintiff began working as an accountant for LSI on September 11, 2006.[23]  Her accounting position required only light physical activity.[24]  Plaintiff participated in LSI's STD-Plan.  The STD-Plan states that Matrix, the claims administrator, will determine whether a disability exists with respect to a participant on the basis of objective medical evidence.[25]  The STD-Plan defines disability as "any physical or mental condition arising from an illness,

---

[20]*See Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1098 (10th Cir. 1999) (noting that there is no per se rule of significant economic impact, and that the long term disability costs amounted to a mere .3% of the company's operating expenses for the year).

[21]*See Lucas v. Liberty Life Assurance Co. of Boston*, 444 F. App'x 243, 246 (10th Cir. 2011) (citing *Holcomb v. Unum Life Ins. Co. of Am.*, 578 F.3d 1187, 1193 (10th Cir. 2009)).

[22]*Holcomb*, 578 F.3d at 1192 (quotations omitted).

[23]Admin. Rec. ("AR") at 193 (Doc. 46) (filed conventionally under seal).

[24]AR at 194.

[25]Doc. 44-1 (Ex. 1 at LSI (Hickman) 000010, § III.B).

pregnancy or injury which renders a Participant incapable of performing the material duties of his or her regular occupation or any reasonably related occupation."[26]  Objective Medical Evidence means:

> [A] measurable abnormality which is evidenced by one or more standard medical diagnostic procedures including laboratory tests, physical examination findings, X-rays, MRIs, EEGs, ECGs, CAT scans or similar tests that support the presence of a Disability or indicate a functional limitation.  Objective Medical Evidence does not include physician's opinions based solely on the acceptance of subjective complaints (e.g. headache, fatigue, pain, nausea), age, transportation, local labor market and other non-medical factors.  To be considered an abnormality, the test result must be clearly recognizable as out of the range of normal for a healthy population; the significance of the abnormality must be understood and accepted in the medical community.[27]

The STD-Plan states that "the Plan Administrator will make a determination as to the eligibility of the Participant for benefits."[28]  It also gives the Plan Administrator the power to interpret the STD-Plan.[29]

On November 8, 2008, Plaintiff notified Matrix that she believed she was disabled.[30]  On December 8, 2008, Plaintiff filed a claim for disability benefits under the STD-Plan.[31]  Plaintiff's application for benefits concedes that she nevertheless continued working through January 9, 2009 — two full months after indicating that she believed she was "disabled."[32]

---

[26]*Id.* at 000005, § I.C.

[27]*Id.* at 000006 § I.H.

[28]*Id.* at 000016, § V.C.

[29]*Id.* at 000020, § VII. A.5.

[30]AR at 192.

[31]AR at 162.

[32]AR at 193.

Plaintiff explained to Matrix that she planned to work all the way up until January 12, 2009, and that she did not want anyone else in the accounting department to handle the year end close.[33] Plaintiff said that the reason she wanted to take leave was that she needed time "to regroup" and to "get away from the stress" and time to have further testing done and to participate in physical therapy.  Plaintiff also said that the deciding factor in determining the length of her leave was that she wanted to come back to the accounting department at the beginning of a new quarter because that would be easier.[34]

Plaintiff's primary treating physician is Kimberly Allman, M.D.  Dr. Allman diagnosed her with fibromyalgia and referred her to Dr. Shahouri, a rheumatologist, who saw Plaintiff on November 10, 2008, for her fibromyalgia.[35]  Dr. Shahouri noted that Plaintiff complained of generalized aches and pains and diffuse muscle pain.[36]  Plaintiff reported to Dr. Shahouri that she had generalized fatigue and non-refreshing sleep.[37]  She denied any "acute hot, tender, or swollen joints."[38]  After examining Plaintiff at Dr. Allman's request, Dr. Shahouri did not conclude that Plaintiff was unable to work.  Instead, he concluded the exact opposite and "stressed the importance of daily activity and to ***continue her work***."[39]

---

[33]AR at 168.

[34]*Id.*

[35]AR at 189.

[36]*Id.*

[37]*Id*.

[38]*Id.*

[39]*Id.* (emphasis added).

On December 8, 2008, Plaintiff saw Dr. Allman.[40]  This was her last scheduled visit with Dr. Allman — a full month before she stopped working.[41]  Dr. Allman's notes show that Plaintiff inquired about applying for disability to "see how she does not working."[42]  Dr. Allman's notes also show that Plaintiff's condition was alleviated by Duragesic patches, and that "[s]he is worse on the days that she works.  She has incredible pain and fatigue.[43]

> Consultation letter from Shadi Shahouri, M.D., "She has 18 of 18 tender points over the trunk and extremities bilaterally . . . Unfortunately, she failed Lynica, Neurontin, and Cymbalta.  She is already taking strong pain pills . . . .  If the patient is interested in more pain medication, then I suggest she see a Pain Management Clinic."[44]

Dr. Allman also referred Plaintiff to Dr. Meek, who saw Plaintiff on December 17, 2008, for a thyroid condition.[45]  Dr. Meek determined that Plaintiff's thyroid was not enlarged, her heart rate was normal, her skin was normal, and that there was no evidence of exophthalmos.[46]  Dr. Meek concluded that Plaintiff was in remission of Grave's disease following a year of treatment with anti-thyroid drugs.[47]  Accordingly, Dr. Meek advised Plaintiff to stop anti-thyroid

---

[40]AR at 178.

[41]AR at 193, 168.

[42]AR at 178.

[43]*Id.*

[44]AR at 189.

[45]AR at 187.

[46]*Id.*

[47]*Id.*

therapy.[48]  Dr. Meek never concluded that Plaintiff was unable to work.[49]

Dr. Allman completed a Matrix form entitled "Health Care Provider Certification" on

December 24, 2008, with the following information:

> First Date Patient was unable to work *1/12/09* Anticipated Return to Work Date:
> *4/13/09* . . . prevent this patient from working: *pain*.  Date of initial visit: *6/21/07*
> *(for this concern)*  Total number of visits *16* . . . Objective findings: *18/18 tender*
> *points for fibromyalgia. Consult with rheumatology.*[50]

On January 7, 2009, Plaintiff was interviewed over the phone by Heather McCulloch, an

RN for Matrix.  The notes from this conversation provide: "EE explained that she has a pain

disorder, fibromyalgia, Graves Disease, IBS, and fatigue."[51]  On January 12, 2009, Matrix noted

the following:

> VMM from EE . . . leave starts today . . . reviewed by our medical staff today and
> there is no support for a disability.  Explained plan requires OME [objective
> medical evidence] which she doesn't have. Expl that's usually case with
> fibromyalgia.  Told her I don't doubt she's in pain, but nothing in records to show
> diagnostic evidence of worsening of condition.  *She said she thinks she has IBS,*
> *can't eat, but then said she hasn't seen doctor for that yet. Told her that could not*
> *be considered.*  I'll send denial notice to LSI and she'll have to work something
> out with her manager.[52]

On January 12, 2009, Nurse McCulloch sent an email to Miki Wood, also with Matrix,

stating as follows:

> EE continued to work after discussing possible disability time off with her MD.
> EE explains that she needed to keep working due to end of the year accounting
> requirements, however if EE was able to work during this time period, it is not

---

[48]*Id.*

[49]*Id.*

[50]AR at 343.

[51]AR at 168.

[52]AR at 198.

clear what would now prevent the EE from working and participating in PT and sleep study during off hours from work.[53]

On January 13, 2009, Matrix denied Plaintiff's application.[54]  The reason  for the denial was stated to be as follows:

> We have reviewed the medical records provided by your physician, Dr. Kimberly Allman. There is no mention of any abnormal test results or objective medical evidence as defined in the LSI Short Term Disability Plan. In addition, our records indicate you were able to continue working after you filed your claim. Based on this information and our review, there is no evidence of a significant change in your condition.  The medical documentation provided does not indicate work incapacity or disability as defined by the Plan.[55]

On February 25, 2009, Plaintiff appealed Matrix's denial pursuant to a letter describing her fibromyalgia and referring to her IBS, as follows:

> In addition, I have had several tests done by a gastroenterologist. These tests are included in my new submission by Dr. Leavens [sic]. The findings of my scopes were intense gastritis, which is painful and complicating my other conditions.  In addition, I have non-specific inflammation of the colon, which seems to make my IBS much worse.  I have stomach and bowl [sic] pain, nausea, irregular bowel movements, and fatigue . . . I am to go back to Dr. Leavens [sic] to follow-up on my symptoms in April.[56]

Plaintiff's appeal letter describes fibromyalgia as "a condition that results in pain, fatigue, bowel and stomach issues, depression, and inability to concentrate, among other things."[57]  Plaintiff went on to state that she needed disability benefits to have time to attend physical therapy.[58]

---

[53]AR at 376.

[54]AR at 134-35.

[55]*Id.*

[56]AR at 400, 432.

[57]AR at 400.

[58]*Id.*

Emails between Grace Leayman, Benefits Administrator, and Christine Huntley of LSI

on January 21, 2009, regarding Plaintiff's presence on her job, state:

> Yes, she returned on 1/19.  BUT she was then out sick yesterday. This is
> definitely going to impact her performance . . . . Even though her specialist says
> she could go through rehabilitation while working, she won't do it.  I guess it is
> too painful and she can't work after a session.  Not sure why there is such a
> disconnect with what she feels she can do and what the doctor sees.  Frustrating![59]

Plaintiff was referred by Dr. Allman to a gastroenterologist, Dr. Lievens.  A Consult

Report dated January 22, 2009, by Dr. Lievens, includes the following entry:

> She had a common bile duct stone, and I did an endoscopic retrograde
> cholanglopancreatography (ERCP) and removed that stone. She is here now for
> another reason.  She says that she had a reaction to Chantix one and a half years
> ago, and it "messed her up."  She had alternating diarrhea and constipation. When
> she is constipated, her stools are soft; but she has a difficult time passing them
> and only has a bowel movement every couple of days. When she is having
> diarrhea, she will go 10 to 12 times per day. All of the stools tend to occur in
> about a five-hour period. They are loose, urgent, painful to pass, and contain a lot
> of mucus . . . IMPRESSION: 1. Diarrhea 2. Abdominal pain, upper and lower. 3.
> Blood in her stools. 4. Change in bowel habit. 5. Chronic narcotic use. 6. Tobacco
> abuse.[60]

Dr. Lievens' January 22, 2009 report recites Plaintiff's complaints of bowel problems from a

year earlier.[61]

Regarding Plaintiff's complaints of gastrointestinal problems, notations on a lab report

from tests done on January 22, 2009, by Kansas Gastroenterology, confirmed that the blood tests

performed were "all normal."[62]

---

[59]AR at 268.

[60]AR at 420.

[61]*Id.*

[62]AR at 24.

On January 27, 2009, Dr. Shahouri wrote Dr. Allman as follows:

> She is seeing a gastroenterologist for further evaluation of her gastric symptoms .
> . . . ASSESSMENT: 1. Severe fibromyalgia which is limiting her ability to work.
> 2. Generalized fatigue associated with the above. 3. Abdominal pain. This could
> be irritable bowel syndrome. She is currently seeing a gastroenterologist . . . I
> told Tina that there is nothing else I could do to help with her fibromyalgia at this
> level.[63]

After seeing Plaintiff in November 2008, Dr. Shahouri "stressed the importance of daily activity and to continue her work."[64]  Dr. Shahouri did not change that opinion in his January 27, 2009 report.[65]  Nor does Dr. Shahouri state that there has been a worsening in Plaintiff's symptoms such that she is no longer capable of working.[66]  The report also recommends physical therapy and a functional capacity evaluation.  The administrative record is devoid of any functional capacity evaluation.  Dr. Shahouri also states in the January 27, 2009 report that Plaintiff's fatigue is a derivative symptom of her fibromyalgia, not a separate condition.[67]

On February 2, 2009, Dr. Allman made the following entry: "She continues to have significant abdominal pain and has an EGD and colonoscopy scheduled this week."[68]  Dr. Allman did not state in her February 2, 2009 report that Plaintiff was incapable of work due to her intestinal pain.[69]

---

[63]AR at 406.

[64]AR at 189.

[65]AR at 406.

[66]Id.

[67]Id.

[68]AR at 29.

[69]Id.

The patient chart and discharge summary for procedures by Dr. Lievens on February 4, 2009, include the following:  "Discharge Summaries . . . EGD and COLONOSCOPY INDICATION FOR PROCEDURE:  Diarrhea, abdominal pain, weight loss, and rectal bleeding . . . . IMPRESSION: 1. Intense gastritis.  2. Possible mild duodenitis.  3. Mild edema throughout the colon."[70]

On February 10, 2009, Dr. Lievens provided results of biopsies taken at a esophagogastroduodenoscopy and colonoscopy of Plaintiff.[71]  Dr. Lievens determined that Plaintiff had nonspecific inflammation, but did not have celiac disease.[72]  He also determined that there was no evidence of inflammatory bowel disease, microscopic colitis, or precancerous or cancerous tissue.[73]  Neither Kansas Gastroenterology nor Dr. Lievens ever concluded that Plaintiff was unable to work.[74]

An email from Christine Huntley, of LSI, dated February 11, 2009, included the following: "FYI -- the stomach problems are different than the original fibromyalgia (sp?) issue that she filed the first claim for, so she may need guidance from Matrix . . .."[75]

Karen Hahn, with LSI, performed a "Job Analysis" on March 6, 2009, which stated the following: "COMMENTS/ACCOMMODATIONS AVAILABLE:  She can come back part time

---

[70]AR at 17.

[71]AR at 14.

[72]*Id.*

[73]*Id.*

[74]AR at 14, 24.

[75]AR at 226.

if needed."[76]

Dr. Dikranian, certified by the American Board of Internal Medicine in Rheumatology, performed a peer review regarding Plaintiff's claim at Matrix' request.[77]  Dr. Dikranian evaluated all of the medical records provided by or on behalf of Plaintiff, including the medical records from Dr. Allman, Dr. Shahouri, Dr. Meek, and Dr. Lievens.[78]  In his March 24, 2009 Report, Dr. Dikranian found that "[t]hough there are objective findings of tender trigger points, there is _**no documentation of impairment due to the pain and tenderness to support restrictions or limitations of less than sedentary work.**_  A motivation for STD benefits seems to be non-physical/mental stress avoidance and completion of outpatient therapy, which could be accomplished with a minimally reduced (if at all) work schedule."[79]  In his report, Dr. Dikranian also stated:

> [t]here is _**no objective evidence to support a change in the claimant's condition**_ that would suggest the objective findings of tenderness in trigger points ever _**rose to the level of disability**_ such that she was "incapable of performing the material duties of her regular occupation or any reasonably related occupation."  Her disease manifestations and severity, though chronic, seem to be stable and essentially unchanged as documented in the clinical records submitted for review.[80]

Dr. Dikranian stated unequivocally that:

Ms. Hickman is capable of returning to her regular or similar occupation at present. _**There is no documentation of impairment significant enough to preclude sedentary work with reasonable accommodations for her fatigue**_.  The lack of documented restrictions on

---

[76]AR at 148.

[77]AR at 113-17.

[78]AR at 113.

[79]AR at 115 (emphasis added).

[80]_Id._ (emphasis added).

range of motion of her joints, objective weakness, or tenderness severe enough to preclude her from sitting for 6 hours per day, walking 1 hour per day, typing/computer work "off and on throughout the day," and writing 'not very often' supports her ability to perform sedentary work.[81]

Dr. Dikranian concluded that "Ms. Hickman is capable of sedentary work during an 8 hour workday.  She is incapable of heavier workloads due to her fatigue and pain caused by fibromyalgia."[82]  When asked whether the objective medical findings were severe enough to render Plaintiff disabled, Dr. Dikranian replied that "there are no objective findings that indicate the syndrome was severe enough to render the claimant disabled from performing her regular or similar occupation as defined by the Plan."[83]

On April 3, 2009, Grace E. Leayman, Benefits Administrator, sent an email to Miki Wood, Sr. Integrated Claims Examiner for Matrix, asking the following: "Can you guide me to the medical record in the Matrix file from her primary doctor indicating immediate leave on or about 12/8/08."[84]  Miki Wood responded as follows: "Ok, in the 12/8/08 note, first paragraph, 'She wonders about disability to see how she does not working.' The 3rd page of the note, last section 'Try short term disability to see if improvement occurs.'"[85]

The Committee considered Plaintiff's claim on April 23, 2009.  The minutes of the meeting show that Grace Leayman, Benefits Administrator, was present, along with Leslie Rife, Director, Global Benefits, LSI, as "Non-voting Attendees."  In making its decision, the

---

[81]AR at 115-16 (emphasis added).

[82]AR at 116.

[83]Id.

[84]AR at 120.

[85]AR at 119.

Committee reviewed a case summary, Plaintiff's appeal letter, the documentation submitted by

Plaintiff, and the full claim file provided by Matrix, including all of the medical records in the

claim file.[86]  The minutes, in part, state:

> Grace reviewed the Brief Case Summary (attached) which summarizes the
> Short-Term Disability claim, appeal and issues. . . .  The Committee members do
> not doubt the validity of the illness, however, the lack of objective medical
> evidence supports the denial of the Short-Term Disability claim . . . .  The
> Committee wanted to know if the Short-Term Disability claim was strictly for the
> fibromyalgia. The answer is yes.[87]

> A "Brief Case Summary" was presented to the Committee which included the following:

> Ms. Hickman's LOA began 1/12/09 due to symptoms related to fibromyalgia,
> Grave's disease, irritable bowel syndrome and fatigue . . . . Ms. Hickman's file
> was sent to Dr. Dikranian for a peer review . . . Objective medical findings
> documented in her clinical notes support the diagnosis of fibromyalgia, namely
> the presence of chronic, widespread pain in the presence of standard accepted
> tenderness in at least 11 of 18 defined trigger points.  However, there are no
> objective findings that indicate the syndrome was severe enough to render the
> claimant disabled from performing her regular or similar occupation as defined by
> the Plan.[88]

> On April 23, 2009, the Committee denied Plaintiff's claim on review.[89]  The

Committee's denial included the following pertinent elements:

> Dr. Dikranian stated that based upon the medical records provided, "there are no
> objective findings that indicate the syndrome was severe enough to render the
> claimant disabled from performing her regular or similar occupation as defined by
> the Plan."

> Also, Dr. Dikranian was asked to comment upon whether there is any objective
> evidence to support a change in your condition that would suggest the objective

---

[86]AR at 107.

[87]AR at 107-08.

[88]AR at 432-33.

[89]AR at 152-53.

findings ever rose to the level of disability as defined by the Plan.  He stated, "There is no objective evidence to support a change in the claimant's condition that would suggest the objective findings of tenderness in trigger points ever rose to the level of disability such that she was incapable of performing the material duties of her regular occupation or any reasonably related occupation. Her disease manifestations and severity, through chronic, seem to be stable and essentially unchanged as documented in the clinical records submitted for review."[90]

The Committee's decision stated that "the Committee members do not doubt the validity of the illness, however, the lack of objective medical evidence supports the denial of the Short-Term Disability claim."[91]  Five Committee members voted unanimously to uphold the decision.[92]  LSI notified Plaintiff of the Committee's decision on April 23, 2009.[93]

On May 6, 2009, Marianne Pullam, an RN for Matrix, reported to the Benefits Administrator, regarding a telephone conversation she had with Plaintiff, the following:

I spent a long time just now speaking with Tina Hickman . . . . She continues to treat with Dr. Allman (PCP), Dr. Shahouri (rheumatologist) and her gastroenterologist Dr. Lievens . . . . She listed multiple treatments she's tried which all seem appropriate and unfortunately all have failed . . . . I did give her info on multidisciplinary pain clinics and their effectiveness for chronic pain.  She plans to discuss this with her doctor as she feels she has "tried everything" and will continue to do so as she really wants to get better . . . I really do feel for this lady and hope she finds the path to wellness, soon![94]

Dr. Allman responded on May 6, 2009, to a Matrix inquiry of April 24, 2009, as follows:

Please list current physical restrictions and limitations: *Physical restrictions are due to pain and fatigue. Has trouble staying awake throughout the day.*

Are there any accommodations which might allow her to return to work at this

---

[90]AR at 153.

[91]AR at 107.

[92]AR at 108.

[93]AR at 152-53.

[94]AR at 101.

time? *Only accommodation would be her ability to work on a day to day basis based on her symptoms. She would not be able to be as consistent as desired. I feel it is doubtful she will be able to return to work at her previous job on a consistent basis.*[95]

Marianne Pullam, a RN for Matrix, sent an email to the Benefits Administrator on May 6, 2009, referring to Dr. Allman's May 6, 2009 response and stating that "the doctor feels that it is doubtful that she will ever be able to return to work to her usual and customary job."[96]

On December 9, 2009, Matrix contacted Dr. Allman to determine whether Plaintiff could return to work with restrictions.[97]  Heather McCulloch, the Nurse Case Manager following Plaintiff's absence for LSI and Matrix, sent a letter to Dr. Allman seeking updated information. On January 6, 2010, Dr. Allman responded to Matrix's query as follows:

> They need to know with a reasonable amount of certainty your expectation for any return to work.
>
> Are there any accommodations that might allow her to return to work at this time? *None*
>
> Please list the date you feel she may return to work with the above accommodations. Start date *None*
>
> Please list your opinion (even if it is an estimate) for end of temporary transitional work or full duty return to work date: *None*.[98]


## IV.    SUMMARY JUDGMENT

Summary judgment is appropriate if the moving party demonstrates "that there is no

---

[95]AR at 97.

[96]AR at 99.

[97]AR at 52.

[98]AR at 52-53.

genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law."[99]

Cross-motions for summary judgment "are to be treated separately; the denial of one does not

require the grant of another," but "[t]o the extent the cross-motions overlap, however, the court

may address the legal arguments together."[100]  The material facts are undisputed in this case, and

both parties argue that they are entitled to judgment as a matter of law in this administrative

appeal.  The parties assert the same legal issues, which can be addressed in response to

Plaintiff's claims.

## V.    DISCUSSION

Plaintiff asserts the following arguments in support of her claim that the Committee's

decision is arbitrary and capricious.

1.    <u>Was the initial adverse determination based on criteria not in the STD-Plan</u>?

Plaintiff argues that imposing the eligibility requirement of a "significant change in your

condition," by LSI was arbitrary and capricious because it did not follow the terms of the STD-

Plan.  The initial denial from Matrix states: "Based on this information and our review, there is

no evidence of a significant change in your condition."[101]  Plaintiff argues that when the

administrator denied benefits because Plaintiff did not have a "significant change in [her]

condition," it imposed a condition for eligibility that is not required in the STD-Plan.

The initial denial sets forth the STD-Plan's definitions of "disability" and "objective

medical evidence," and finds a lack of abnormal test results or objective medical evidence as

---

[99]Fed. R. Civ. P. 56(a).

[100]*Berges v. Standard Ins. Co.*, 704 F. Supp. 2d 1149, 1155 (D. Kan. 2010) (quotations omitted).

[101]AR at 162-63.

defined in the STD-Plan.[102]  The definition of "disability" in the STD-Plan does not refer to a

"significant change in condition."  However, Matrix's decision was explicitly based on the

correct criteria: the lack of objective medical evidence that Plaintiff was incapable of working.

The reference to the lack of a change in her condition is simply a factual finding relevant to

applying the STD-Plan's criteria.  The fact that there had been no significant change in her

condition since she was actually working is relevant in determining the STD-Plan's criteria for

receiving benefits (i.e. that she was incapable of working with her condition).  Specifically, the

fact that her condition was the same both while she was working and after she stopped working

is evidence that her condition did not render her incapable of performing the material duties of

her job.  The relevance of her ability to continue working is addressed in more detail below.

Plaintiff has not shown that the initial determination was based on criteria outside of the STD-

Plan.

2.      <u>Did LSI fail to provide a full and fair hearing by failing to consider Plaintiff's evidence
        relating to disability caused by medical conditions other than fibromyalgia</u>?

        Plaintiff argues that when the Committee was incorrectly informed that Plaintiff's claim

was based solely on fibromyalgia, it ignored evidence in the record that supports a disabling

condition beyond that of fibromyalgia, namely — Irritable Bowel Syndrome ("IBS"), diarrhea,

constipation, and fatigue.

        The administrative record makes it clear that the Committee did, in fact, consider all of

those conditions, by listing materials reviewed and specifically listing the full claim file and

medical records provided by Plaintiff.  The minutes state that "[d]uring the course of the

---

[102]AR at 162.

meeting, the Appeals committee reviewed the issues raised in Tina's appeal letter, the medical documentation and test results provided by Tina and the full claim file provided by Matrix."[103] Plaintiff's appeal letter states that her "primary condition is Fibromyalgia. . . .  Fibromyalgia is a condition that results in pain, fatigue, bowel and stomach issues, depression, and inability to concentrate, among other things."[104]  In addition, the Committee's minutes show that they "reviewed the Brief Case Summary (attached) which summarizes the Short-Term Disability claim, appeal and issues."[105]  The Brief Case Summary states that Plaintiff's "LOA began 1/12/09 due to symptoms related to fibromyalgia, Grave's disease, irritable bowel syndrome and fatigue."[106]

The administrative record reflects that the Committee did review all the medical records and considered Plaintiff's claims relating to IBS, diarrhea, constipation and fatigue.  Plaintiff fails to show that the medical records pertaining to those conditions/symptoms establish an inability to perform the material duties of her position.  The Court rejects this argument as grounds for finding that LSI's decision to deny Plaintiff benefits was arbitrary and capricious.

3.    Is the LSI medical reviewer's opinion flawed?

Plaintiff argues that the opinion of LSI's medical reviewer, Dr. Dikranian, is flawed because (1) it fails to explain how he reached the conclusion that the severity of Plaintiff's pain was insufficient to preclude sedentary work; (2) it does not sufficiently consider Plaintiff's IBS;

---

[103]AR at 107.

[104]AR at 3.

[105]AR at 107.

[106]AR at 109.

and (3) it was not based on an accurate description of Plaintiff's regular occupation.

During the review process, LSI submitted medical and other records to Dr. Dikranian for review.[107]  Dr. Dikranian concluded that Plaintiff "is a 30 year old cost accountant with fibromyalgia, Grave's disease, irritable bowel syndrome and fatigue."[108]  Although Dr. Dikranian determined that there were "objective findings of tender trigger points" to support a diagnosis of fibromyalgia, he found that "there is no documentation of impairment due to the pain and tenderness to support restrictions or limitations of less than sedentary work."[109]

Plaintiff argues that it was unreasonable for Dr. Dikranian to conclude that Plaintiff has physical impairments and restrictions due to fibromyalgia but that these restrictions are less than the restriction level which would preclude her from sedentary work.  Plaintiff asserts that Dr. Dikranian offers no explanation and cites no authority.  Dr. Dikranian's "explanation" is that he found that "there is a lack of documentation of impairment due to the pain and tenderness to support restrictions or limitations of less than sedentary work."  The role of Dr. Dikranian, like the role of the Committee, is to evaluate the record that is presented to them, and to determine whether the record establishes that Plaintiff is incapable of performing the material duties of her position.  "[N]othing in ERISA requires plan administrators to go fishing for evidence favorable to a claim when it has not been brought to their attention that such evidence exists."[110]

Plaintiff argues that Dr. Dikranian's report fails to take into account her IBS and should

---

[107]AR at 439-45.

[108]AR at 442.

[109]AR at 443.

[110]*Holt v. Cont'l Cas. Co.*, 379 F. Supp. 2d 1157, 1175 (D. Kan. 2005) (quoting *Gaither v. Aetna Life Ins. Co.*, 394 F.3d 792, 804 (10th Cir. 2004)).

not be used as a basis for denial of benefits.  Plaintiff argues that Dr. Dikranian offered no explanation of how Plaintiff's IBS symptoms would or could be accommodated such that she could use the restroom ten to twelve times during a five-hour period.  Clearly, Dr. Dikranian did consider Plaintiff's IBS, in that he found that Plaintiff "is a 30 year old cost accountant with . . . irritable bowel syndrome."  Dr. Dikranian's report does consider her claim of IBS, and he specifically found that Plaintiff was capable of sitting for six hours in a day and performing light work.

LSI disputes the suggestion that Dr. Dikranian did not review a description of Plaintiff's regular occupation.  Although Dr. Dikranian's report specifically states that he reviewed a Job Analysis, Plaintiff argues that the "Job Analysis" provided to Dr. Dikranian included the comment, "she can come back part time if needed," and that Dr. Dikranian relied on this accommodation language in his analysis.[111]  Plaintiff argues that Dr. Dikranian apparently thought that accommodation was available for Plaintiff's job when he concluded "[t]here is no documentation of impairment significant enough to preclude sedentary work with reasonable accommodation for her fatigue."[112]  Plaintiff asserts that because the Job Analysis given to Dr. Dikranian indicated that Plaintiff would be permitted to work part time as needed, it was reasonable for him to believe that Plaintiff's "own occupation" requirements would permit her to work less than full time as an accommodation.

Plaintiff argues that her occupation description should only include the tasks she was required to perform at the time of her termination, and at that time, the accommodation offered

---

[111]AR at 148.

[112]AR at 443.

by LSI in its Job Analysis was not effective — it was for the future if Plaintiff returned to LSI. Plaintiff's last day worked was January 9, 2009,[113] while the Job Analysis was prepared on March 6, 2009.[114]  Plaintiff cites *Bishop v. Long Term Disability Income Plan of SAP America, Inc.*,[115] as holding that the relevant standard for "own occupation" is the insured's own job with his employer at the time he was terminated.  Therefore, Plaintiff argues that there was no description of her regular occupation, or at least a correct description, provided to Dr. Dikranian.

The court in *Bishop* dealt with a plan providing that the employee is totally disabled if he is "unable to perform all the essential duties of his occupation."[116]  The court noted that the plan did not define "essential duties" or "his occupation" nor did it establish a method for determining the "essential duties of his occupation."[117]  The court held that, in that case, the plan administrator was required to consider the claimant's actual job duties in defining "his occupation."[118]  The court remanded for further proceedings addressing whether a travel accommodation given to the employee was applicable at the time of his termination.[119]

In this case, the STD-Plan defines disability as rendering the claimant "incapable of performing the material duties of his or her regular occupation or any reasonably related

---

[113]AR at 193.

[114]AR at 149.

[115]232 F. App'x 792 (10th Cir. 2007).

[116]*Id.* at 793.

[117]*Id.* at 794.

[118]*Id.* at 795.

[119]*Id.*

occupation."  In contrast, the STD-Plan defines "Active Employment" as "performance by the Employee of the regular duties of his or her work."[120]  Thus, unlike the language in *Bishop*, the definitions in the STD-Plan in this case are more similar to those interpreted in other cases because it has a reference to the general occupation.  In *Panther v. Synthes*, the court looked at language in the plan referring to "all of the material and substantial duties of his own occupation," and held that "own occupation" means one's general profession, rather than one's specific duties for a particular employer.[121]  Other cases that have dealt with disability definitions embracing not only the claimant's job, but a job of the same general character with comparable duties, have held that:

> A job that afforded accommodation, to enable [the claimant] to perform the essential duties of her occupation, would be a job of the same general character as [the claimant's] original positions.  Therefore it was not unreasonable for the appeal committee to attempt to determine whether [the claimant] could perform the essential duties of her own occupation with reasonable accommodation.[122]

In *Holcomb*, an independent neuropsychologist found that although the claimant had a problem with delayed memory, "[d]ue to her intact general intellectual and problem solving ability, the utilization of compensatory strategies (e.g., memory notebook) would likely ameliorate this situation."[123]  In response to the neuropsychologist's diagnosis, the claimant in that case argued that the policy did not include a qualification that she be able to work in any gainful occupation "with accommodations," and that the defendant had attempted to rewrite the

---

[120]Doc. 44-1 at 5.

[121]371 F. Supp. 2d 1267, 1276 (D. Kan. 2005) (also distinguishing "Actively at Work" definition).

[122]*Mead v. Reliastar Life Ins. Co.*, 755 F. Supp. 2d 515, 533 (D. Vt. 2010); *see also Holt v. Cont'l Cas. Co.*, 279 F. Supp. 2d 1157, 1169 (D. Kan. 2005) (stating that the terms of the Plan do not prohibit consideration of offers by the employer to modify the work requirements when determining a claim for disability.).

[123]*Holcomb v. Unum Life Ins. Co. of Am.*, 578 F.3d 1187, 1193-94 (10th Cir. 2009).

policy for the purpose of denying her benefits.[124]  The Tenth Circuit found that because the

claimant's "argument overstates the significance of one sentence in a large administrative record,

it is unavailing."[125]

      This Court finds that Plaintiff's argument here is unavailing.  In *Berges*, the court noted

that "[t]he exact job title, however, is not as important as the job duties," and held that it could

not find that the "vocational analysis was so flawed that it did not provide Defendant with a

reasonable basis to find that Plaintiff's occupation was Chief Financial Officer and that it was a

sedentary position as performed in the general economy."[126]  Dr. Dikranian's report makes clear

that he understood the demands of Plaintiff's sedentary accounting position when he stated in his

report that: "Physical job factors require sitting 6 hours per day and walking 1 hour per day;

typing/computer work 'off and on throughout the day' and writing 'not very often.'  Overall

physical work level is sedentary.  Accommodations available: 'she can come back part time if

needed.'"[127]  Dr. Dikranian's report, read as a whole, is clear.  He responds to various "Questions

for review" as follows:

> 1. Is there any objective medical evidence which precluded Ms. Hickman from
> working as an accounting analyst with or without restrictions and/or limitations?
>
>       Though there are objective findings of tender trigger points, there is no
> documentation of impairment due to the pain and tenderness to support restrictions or limitations
> of less than sedentary work.  A motivation for STD benefits seems to be non-physical/mental
> stress avoidance and completion of outpatient therapy, which could be accomplished with a
> minimally reduced (if at all) work schedule.  Concluding impairment due to psychological
> causes is not within the scope of my expertise.

---

[124]*Id.* at 1194.

[125]*Id.*

[126]*Berges v. Standard Ins. Co.*, 704 F. Supp. 2d 1149, 1184 (D. Kan. 2010).

[127]AR at 442.

* * *

3.  Is there any objective evidence to support a change in Ms. Hickman's condition that would suggest the objective findings ever rose to the level of disability as defined by the Plan?

There is no objective evidence to support a change in the claimant's condition that would suggest the objective findings of tenderness in trigger points ever rose to the level of disability such that she was "incapable of performing the material duties of her regular occupation or any reasonably related occupation." Her disease manifestations and severity, though chronic, seem to be stable and essentially unchanged as documented in the clinical records submitted for review.

4.  I s Ms. Hickman capable of returning to her regular or similar occupation?  If not, when do you expect Ms. Hickman to be able to return to her regular or similar occupation?  Please indicate the objective medical findings that support your conclusion.

Ms. Hickman is capable of returning to her regular or similar occupation at present.  There is no documentation of impairment significant enough to preclude sedentary work with reasonable accommodations for her fatigue.  The lack of documented restrictions on range of motion of her joints, objective weakness, or tenderness severe enough to preclude her from sitting for 6 hours per day, walking 1 hour per day, typing/computer work "off and on throughout the day," and writing "not very often" supports her ability to perform sedentary work.

* * *

6.  Please indicate Ms. Hickman's functional capacity based on the records.

Ms. Hickman is capable of sedentary work during an 8 hour workday. She is incapable of heavier workloads due to her fatigue and pain caused by fibromyalgia.

7.  Please indicate how Ms. Hickman's functional capacity during the period of time in question is supported by objective medical findings.

The medical findings of tenderness in trigger points support the claimant's inability to perform more than sedentary work.  There is no documentation of her inability to sit for 6 hours per workday, but should be given opportunity to change position or stand at will to stretch.  She is able to stand or walk for 1 hour per day, can repetitively use her hands/grasp/grip frequently, bend/kneel/crouch/stoop/reach above or below shoulder level occasionally.

8.  If there are objective medical findings, please indicate if the objective medical findings were severe enough to render Ms. Hickman disabled from performing her regular or similar occupation as defined by the Plan.

Objective medical findings documented in her clinical notes support the diagnosis of fibromyalgia, namely the presence of chronic, widespread pain in the presence of standard accepted tenderness in a least 11 of 18 defined trigger points. However, there are no objective findings that indicate the syndrome was severe enough to render the claimant disabled from performing her regular or similar

28

occupation as defined by the Plan.[128]

The Court cannot find that LSI's reliance on Dr. Dikranian's report is unreasonable when the report is read in its entirety.

4.   Is LSI's failure to explain its rejection of the opinion of one of its own medical advisors unreasonable?

Plaintiff argues that on May 6, 2009, a medical-expert employee of Matrix, Nurse Pullam, had a conversation with Plaintiff and concluded that Plaintiff's treatments with Dr. Allman and Dr. Lievens were "appropriate" and "all have failed."[129]   Plaintiff argues that this opinion from a medical-expert employee of Matrix, which provides claim review services, is similar to an admission against interest.

This "opinion" that Plaintiff refers to is contained in an email from Nurse Pullam.  She states that she has spoken to Plaintiff and has "learned after speaking with her: . . . She listed multiple treatments she's tried which all seem appropriate and unfortunately all have failed."  After speaking with Plaintiff, Nurse Pullam concluded that Plaintiff's treatments have failed to cure her "systemic issues."  This email suggests that Plaintiff's treatments have failed, but it does not set forth an opinion about Plaintiff's ability to work.  LSI does not deny that Plaintiff has fibromyalgia, but rather argues, that even though Plaintiff suffered from fibromyalgia, her symptoms were not so severe as to make her incapable of performing the material duties of her occupation.  The Court rejects this argument as grounds for finding that LSI's decision to deny Plaintiff benefits was arbitrary and capricious.

5.   Does the paradox of the STD and LTD determinations require a remand?

---

[128]AR at 443-44.

[129]AR at 101.

Plaintiff filed a claim for long term disability with Reliance Standard Life Insurance Company ("Reliance"). Plaintiff argues that the Court should remand because, for purposes of her long term disability claim, Reliance determined that she was disabled beginning in January 2009, based on the more rigorous requirement of the "any occupation" standard. Thus, argues Plaintiff, LSI's finding that she failed to satisfy the lesser "own occupation" standard during the same time period is a sufficient reason to remand this case to LSI for further review.

Plaintiff received long term disability benefits based on a mental or nervous disorder that has no bearing on her application for short term disability benefits. Plaintiff originally listed Reliance as a defendant in this case, and sought a determination that Reliance failed to give Plaintiff's evidence a full and fair review, and that Reliance inappropriately determined that her disability fell within the twenty-four month limitation for disability occurring as a result of a mental or nervous disorder.[130] Reliance notified Plaintiff that it required additional information in order to determine if she continued to be disabled beyond the twenty-four month period.[131] This Court held that Plaintiff had not exhausted her administrative remedies, judicial relief was premature, and granted Reliance's motion to dismiss the action against it.[132] The STD and LTD claims are two separate claims with two separate administrative records. The only matter before the Court is review of a denial of Plaintiff's short term disability benefits, and "the court's review is 'limited to the administrative record,' i.e., the materials compiled by the ERISA plan's

---

[130]Doc. 31 at 3 (the Court's May 19, 2011 Memorandum and Order).

[131]*Id.* at 2-3.

[132]*Id.* at 6-7.

30

administrator in the course of making its decision."[133]

6.    <u>Does the fact that Plaintiff continued to work after her diagnosis prove that she is capable of performing her own occupation</u>?

Plaintiff argues that courts have recognized that a claimant may satisfy the eligibility requirements for a disability under a plan, but continue working for a variety of reasons. Plaintiff cites *Hawkins v. First Union Corp. Long-Term Disability Plan*, where the court stated that there is no "logical incompatibility between working full time and being disabled from working full time."[134]  The court in *Hawkins*, noted that:

> A desperate person might force himself to work despite an illness that everyone agreed was totally disabling. . . . Yet even a desperate person might not be able to maintain the necessary level of effort indefinitely.  Hawkins may have forced himself to continue in his job for years despite severe pain and fatigue and finally found it too much and given it up even though his condition had not worsened.  A disabled person should not be punished for heroic efforts to work by being held to have forfeited his entitlement to disability benefits should he stop working.[135]

In *Hawkins*, the court rejected the argument that because the claimant had worked for years despite his fibromyalgia without any indication that his condition worsened over this period, he *cannot* be disabled.[136]

The Court agrees that the fact that a claimant continues to work should not be dispositive if there is counter evidence showing the presence of a disability as defined by the pertinent plan. Also, there are certain circumstances where it may be even less relevant.  "Obviously, where a disability consists of a danger of future negative health events, post-diagnosis employment does

---

[133]*Berges v. Standard Ins. Co.*, 704 F. Supp. 2d 1149, 1155 (D. Kan. 2010) (quoting *Holcomb v. Unum Life Ins. Co. Of Am.*, 578 F.3d 1187, 1192 (10th Cir. 2009) (citation omitted)).

[134]*Hawkins v. First Union Corp. Long-Term Dis. Plan*, 326 F.3d 914, 918 (7th Cir. 2003).

[135]*Id.* (citations omitted).

[136]*Id.* (emphasis added).

not necessarily negate the finding of disability."[137]  Where a claimant returns to work against her doctors' recommendations and thereby hazards her well-being, "return to work should not affect the benefits determination."[138]  This is especially true where the claimant is forced to work by economic considerations.[139]  However, a distinction can be made where there is no suggestion that the claimant's return to work posed a risk to his health nor that he did so contrary to the express advice of his doctors.[140]

In this case, LSI did not disregard evidence to the contrary and deny benefits solely on the basis that Plaintiff continued working.  Rather, the fact that Plaintiff continued to work is consistent with the lack of evidence of disability in this case.  Other courts have also considered the claimant's ability to actually continue working.[141]  In *Guardian Life Ins. Co. of Am. v. Cooper*, the court held that:

> The only reasonable reading of the policy is that Cooper is entitled to benefits only if she is unable to perform the major duties of a registered nurse.  Since Cooper is presently employed as a registered nurse, it is apparent that she is able to perform the major duties of a registered nurse and is not totally disabled under the policy.[142]

---

[137]*Lasser v. Reliance Standard Life Ins. Co.*, 146 F. Supp. 2d 619, 630 (D.N.J. 2001) (citing *Stark v. Weinberger*, 497 F.2d 1092, 1100 (7th Cir. 1974)); *see also Pompe v. Cont'l Cas. Co.*, 119 F. Supp. 2d 1004, 1010 (W.D. Mo. 2000) ("[S]uch an approach would force patients with serious health risks to cripple themselves, or even risk death, in order to be considered disabled . . . .  The law is not so harsh.") (citation omitted).

[138]*Id.* (citations omitted).

[139]*Id.* (citations omitted).

[140]*Id.* at n.6 (distinguishing cases such as *Kaufman v. Provident Life & Cas. Ins. Co.*, 828 F. Supp. 2d 275 (D.N.J. 1992), *aff'd* 993 F.2d 877 (3d Cir. 1993), that hold that continuous and regular employment will preclude a finding of disability).

[141]*See, e.g., Lucas v. Liberty Life Assur. Co. of Boston*, 444 F. App'x 243, 245 (10th Cir. 2011) (finding that defendant's denial of benefits was supported by substantial evidence where defendant emphasized that plaintiff "did hold a full time teaching position.").

[142]829 F. Supp. 1247, 1248 (D. Kan. 1993).

Likewise, in *Crossman v. Media General, Inc.*, the court held that a pilot whose customary duties included both flying and non-flying activities, was not disabled where he continued to perform non-flying duties up until the abolition of his position for non-disability connected reasons.[143] The court in *Crossman* found:

> That same factor — Mr. Crossman's physical presence at work until the bitter end of the flight department . . . — is highly significant in reference to his quest for long-term disability benefits, as well, for, up until the [time he submitted his claims for both short and long-term disability benefits], Mr. Crossman continued to report for work in the flight department, where he performed . . . duties [that] were within Mr. Crossman's customary duties as per his job description.[144]

Plaintiff's ability to continue working was not inconsistent with other evidence in the administrative record and Plaintiff does not assert that her return to work posed a risk to her health nor that she did so contrary to the express advice of her doctors.  Under these circumstances, the Court finds that based on the administrative record as a whole, LSI's consideration of Plaintiff's continuation of work was not arbitrary and capricious.

7.   Is the Committee's narrow, literal interpretation of the term "objective medical evidence" unreasonable?

The parties disagree as to the proper interpretation of the STD-Plan's requirement of "objective medical evidence."  The STD-Plan provides that the plan administrator will "determine whether a Disability exists with respect to a Participant on the basis of [ ] Objective Medical Evidence."[145]  Objective Medical Evidence is defined as:

> [A] measurable abnormality which is evidenced by one or more standard medical diagnostic procedures including laboratory tests, physical examination findings,

---

[143] 9 F. App'x 147 (4th Cir. 2001).

[144] *Id.* at 150.

[145] Doc. 44-1 at 10.

X-rays, MRIs, EEGs, ECGs, CAT scans or similar tests that support the presence of a Disability or indicate a functional limitation.  Objective Medical Evidence does not include physician's opinions based solely on the acceptance of subjective complaints (e.g. headache, fatigue, pain, nausea), age, transportation, local labor market and other non-medical factors.  To be considered an abnormality, the test result must be clearly recognizable as out of the range of normal for a healthy population; the significance of the abnormality must be understood and accepted in the medical community.[146]

The parties dispute whether Dr. Allman's responses should be considered "objective medical evidence."  LSI argues that Dr. Allman fails to refer to objective medical evidence suggesting that Plaintiff was actually incapable of performing the material duties of her position at LSI.  Plaintiff argues that Dr. Allman's entry of December 8, 2008, indicates a physician's diagnostic procedure, partially based on subjective complaints, which is within the scope of LSI's definition of "objective medical evidence."  Plaintiff argues that while "objective medical evidence" does not include a physician's opinion based solely on subjective complaints, the definition does not preclude a physician's opinion merely because it is partially based on subjective complaints.[147]  Plaintiff argues that Dr. Allman had more than just Plaintiff's subjective complaints, her record also included letters from Dr. Shahouri, and she was aware of Dr. Shahouri's conclusion that Plaintiff "failed Lyrica, Neurontin and Cymbalta,"[148] and that Plaintiff's "severe fibromyalgia [ ] is limiting her ability to work."[149]  Plaintiff argues that while Dr. Allman did not express an opinion in her December 8, 2008 entry, she opined on December

---

[146]*Id.* at 6.

[147]Doc. 39 at 34.

[148]AR at 189.

[149]AR at 406.

24, 2008, that Plaintiff was unable to work as of January 12, 2009, because of pain.[150]

Dr. Allman's responses are not supported by objective medical evidence such as the functional capacity evaluation suggested by her own treating physician, Dr. Shahouri.[151] Although Dr. Shahouri recommended an functional capacity evaluation, the administrative record does not contain one.[152]

Dr. Allman found that Plaintiff should "[t]ry to use [physical therapy] to help with pain, fatigue, adjust medications-intensive treatment with [physical therapy].[153] Dr. Allman's notes, reflecting that Plaintiff wondered about applying for disability to "see how she does not working," establish that the root of even that recommendation was Plaintiff's own subjective request, not objective medical evidence.[154] Dr. Allman merely repeated Plaintiff's own conclusion that she would benefit from time away from work.[155] In *Holt v. Continental Casualty Co.*, this Court found that the primary care physician's note stating that "with all his other problems . . . we have both decided that he needs to just consider retirement or disability," did not constitute objective medical evidence.[156] Rather, the "note simply relays a conversation, or an agreement between [the doctor] and the plaintiff."[157]

---

[150]AR at 171-72.

[151]AR at 406.

[152]AR at 406.

[153]AR at 171.

[154]AR at 178.

[155]*See Berges v. Standard Ins. Co.*, 704 F. Supp. 2d 1149, 1189-90 (D. Kan. 2010) (noting that the claimant informed the doctor that she was taking a leave of absence and that she was unable to work).

[156]*Holt v. Cont'l Cas. Co.*, 379 F. Supp. 2d 1157, 1170 (D. Kan. 2005).

[157]*Id.* at 1171.

LSI argues that Dr. Allman provided her subjective opinion, without reference to any objective medical evidence, that there were no accommodations that would allow Plaintiff to return to work, and at no point did she attempt to provide objective evidence of limited range of motion, objective weakness, tenderness severe enough to preclude her from sitting for six hours per day, walking one hour per day, typing, performing computer work or writing.[158] Dr. Allman's responses are not supported by objective medical tests regarding how long Plaintiff was able to stay awake throughout the day.[159]  Similarly, Dr. Allman's responses do not state a specific amount of time Plaintiff is capable of remaining awake, and they do not suggest that Plaintiff is incapable of staying awake for an eight hour work day, particularly with breaks.[160]  Further, Dr. Allman's conclusion that "it is doubtful she will be able to return to work at her previous job," is very different from concluding that Plaintiff is actually incapable of performing the material duties of her occupation.[161]

In *Kimber v. Thiokol Corp.*, the claimant argued that the plan administrator acted arbitrarily by finding that there was a lack of objective evidence in the letter and reports from his treating physician.[162]  The court held that:  "[a] rational plan administrator could find these documents insufficient because they do not contain supporting data for the conclusions reached; for example, the letter from Dr. Williams merely states that Mr. Kimber is 'totally disabled secondary to diabetes, hypertension and the problems associated with this,' but does not include

---

[158]AR at 52-53.

[159]AR at 96-97.

[160]*Id.*

[161]AR at 97.

[162]*Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1099 (10th Cir. 1999).

any reference to clinical data."[163]  In reaching its decision, the court held that "[w]hen a plan administrator is given authority to interpret the plan language, and more than one interpretation is rational, the administrator can choose any rational alternative."[164]

Plaintiff also points to Dr. Shahouri's January 27, 2009 opinion that "fibromyalgia, fatigue, and depression are severe" and were "affecting her ability to function."[165]  However, LSI focuses on Dr. Shahouri's statement at the November 10, 2008 visit that Plaintiff should continue to work.  Dr. Shahouri concluded in November 2008 that Plaintiff should continue working, and he never performed any tests after that which would support a reversal of his recommendation.[166]  His January 27, 2009 opinion does not state that she is incapable of performing the material duties of her sedentary accounting position, and recommends a functional capacity evaluation to determine the severity of the impact on her ability to work.

Plaintiff cites *Meraou v. Williams Co. Long Term Disability Plan*, for the proposition that her attempts to relieve her pain constitute objective medical evidence of the severity of her fibromyalgia.[167]  Plaintiff argues that *Meraou* holds that documentation of recent medical procedures performed to alleviate pain could provide objective medical evidence of the severity of the symptoms of fibromyalgia.  Plaintiff then cites to cases from other jurisdictions dealing with the type of documentation that could provide objective medical evidence to establish the

---

[163]*Id.*

[164]*Id.* at 1100 (citing *Naugle v. O'Connell*, 833 F.2d 1391, 1396 (10th Cir. 1987)).

[165]AR at 406.

[166]AR at 189; *see Gooden v. Provident Life & Acc. Ins. Co.*, 250 F.3d 329, 333-34 (5th Cir. 2001) (finding no abuse of discretion where administrator failed to give treating physician's post-termination changed opinion determinative weight because it was not supported by his previous findings nor the medical evidence.).

[167]221 F. App'x 696 (10th Cir. 2007).

severity of fibromyalgia.[168]

The court in *Meraou*, however, determined that it was reasonable to "require recent, *objective* evidence of the existence of a condition."[169]  The court ultimately determined that it was reasonable for the committee to infer that the combination of claimant's conditions did not result in disability because there was "an absence of sufficient evidence . . . of functional limitations resulting from any of her conditions."[170]  The court also noted that with regard to a claimant's subjective, uncorroborated complaints of pain, "[t]he medical inquiry is therefore intertwined with questions of the claimant's credibility, which are the province of the Plan administrator," and that the treating physician cannot be unchallenged because that would "shift the discretion from the administrator, as the plan requires, to the physicians chosen by the applicant."[171]  Even in the case of "subjective diseases," neither the claimant's own word nor that of her treating physician is conclusive.[172]

Even if Plaintiff's treating physicians had concluded, based on objective medical evidence, that Plaintiff was unable to perform the material duties of her job, the denial of benefits would still be reasonable because it is supported by Dr. Dikranian's conclusion that Plaintiff is capable of performing the material duties of her sedentary accounting position.  "It is

---

[168]*Willis v. Baxter Int'l, Inc.* 175 F. Supp. 2d 819 (W.D.N.C. 2001); *Jordan v. Northrop Grumman Welfare Benefit Plan*, 370 F.3d 869 (9th Cir. 2004).  Plaintiff cites *Willis* and *Jordan*, for the proposition that her daily activities demonstrate her inability to perform the material duties of her occupation.

[169]*Meraou v. Williams Co. Long Term Disability Plan*, 221 F. App'x 696, 704 (10th Cir. 2007) (emphasis in original).

[170]*Id.*

[171]*Id.* at 705-06 (citation omitted).

[172]*Niles v. Am. Airlines, Inc.*, 563 F. Supp. 2d 1208, 1219 (D. Kan. 2008).

well settled that ERISA does not require plan administrators to 'accord special deference to the opinions of treating physicians,' nor does it place 'a heightened burden of explanation on administrators when they reject a treating physician's opinion.'"[173]

There is no dispute that Plaintiff suffers from fibromyalgia. However, the fact that treatments have failed to cure her fibromyalgia has no bearing on whether her fibromyalgia rendered her incapable of performing the material duties of her occupation. Plaintiff failed to present objective medical evidence of the degree of her fatigue and pain. Her treating physician suggested that she undergo a functional capacity evaluation, which could have provided objective findings of the impact of her fibromyalgia. Even though Plaintiff's application for short term disability benefits was based on her hypothesis that not working might improve her condition, the STD-Plan requires proof that she is actually incapable of working, not that taking time off might help her improve her condition.[174] There is no abuse of discretion in denying benefits to a claimant who established the presence of fibromyalgia, but failed to present "reasonable medical evidence concerning the severity of her condition or how it affected her ability to work."[175] Even taking into consideration the alleged conflict of interest, the Court still finds that LSI's denial of benefits is supported by substantial evidence and not arbitrary or capricious.

**IT IS THEREFORE ORDERED BY THE COURT** that Plaintiff's Motion for

---

[173]*Berges v. Standard Ins. Co.*, 704 F. Supp. 2d 1149, 1189 (D. Kan. 2010) (citing *Rasenack ex rel. Tribolet v. AIG Life Ins. Co.*, 585 F.3d 1311, 1325 (10th Cir. 2009) (quoting *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 823 (2003)).

[174]Ex. 1 at LSI (Hickman) 000005.

[175]*Gilbertson v. Alliedsignal, Inc.*, 172 F. App'x 857, 861 (10th Cir. 2006).

Summary Judgment is **DENIED**.

      **IT IS FURTHER ORDERED BY THE COURT** that Defendant's Motion for

Summary Judgment is **GRANTED.**

      **IT IS SO ORDERED.**


Dated: June 28, 2012

                              S/ Julie A. Robinson_____
                              JULIE A. ROBINSON
                              UNITED STATES DISTRICT JUDGE